ONTARIO KNITTING CO. v. STATE.

(Supreme Court, Appellate Division, Third Department. November 15, 1911.)

1. EMINENT DOMAIN (§ 66*)—PUBLIC USE—JUDICIAL POWER.
    In condemnation proceedings, the question whether public use is involved is open to the courts.

    [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 165–167; Dec. Dig. § 66.*]

2. EMINENT DOMAIN (§ 13*)—PUBLIC USE—NECESSITY.
    Land can be condemned for public use only.

    [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 51–53; Dec. Dig. § 13.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. EMINENT DOMAIN (§ 300*)—BARGE CANAL—GOOD FAITH OF APPROPRIATION
—EVIDENCE—WEIGHT.

Evidence *held* to show that the state engineer acted arbitrarily and
without judgment in seeking to appropriate land under the barge canal
act (Laws 1903, c. 147) as amended by Laws 1906, c. 365.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 300.*]

4. EMINENT DOMAIN (§ 271*)—WRONGFUL EXERCISE OF POWER—DAMAGE TO
ADJOINING PROPERTY.

An owner of land adjoining a canal constructed under the barge canal
act (Laws 1903, c. 147) as amended by Laws 1906, c. 365, is not entitled
to recover against the state for damages to his manufacturing business
through ceasing to take orders on receiving notice of unauthorized pro-
ceedings to condemn the property, the proceedings having been after-
wards abandoned, since if he instigated the condemnation proceeding the
owner cannot complain, and if he acted innocently, he was chargeable
with notice of the invalidity of the proceeding.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 271.*]

Smith, P. J., and Betts, J., dissenting.

Appeal from Court of Claims.

Claim by the Ontario Knitting Company against the State of New
York. From a judgment of the Court of Claims (69 Misc. Rep. 145,
125 N. Y. Supp. 57) dismissing the claim, plaintiff appeals. Affirmed.

The "barge canal act," so-called (chapter 147, Laws of 1903), in its third
section, designated the general route of the improved canals and directed the
superintendent of public works and the state engineer to improve them in the
manner indicated. Section 4, as amended by chapter 365 of the Laws of
1906, provided: "The state engineer may enter upon, take possession of and
use lands, structures and waters, the appropriation of which for the use of
the improved canals and for the purposes of the work and improvement au-
thorized by this act, shall in his judgment be necessary. An accurate survey
and map of all such lands shall be made by the state engineer who shall an-
nex thereto his certificate that the lands therein described have been appro-
priated for the use of the canals of the state." Such map, survey, and cer-
tificate are to be filed in his office, and a duplicate certified by him filed in
the office of the superintendent of public works, which latter officer is to
serve upon the owner a notice of the filing of the map, the survey, and cer-
tificate in his office, and thereupon "the entry upon and the appropriation by
the state of the real property therein described for the purposes of the work
and improvement provided for by this act, shall be deemed complete, and
such notice so served shall be conclusive evidence of such entry, and appro-
priation and of the quantity and boundaries of the lands appropriated." Sec-
tion 6 required all work to be done by contract and that the state engineer
divide the canal into sections, make maps, plans, and specifications of the
work to be done and the material furnished for each section, with a detailed
estimate of the cost, and a statement thereof, with the maps, plans, and spec-
ifications when adopted by the canal board, shall be filed in his office and the
office of the superintendent of public works and publicly exhibited to every
person proposing or desiring to make a proposal for such work. It further
provided: "No alteration shall be made in any such map, plan or specifica-
tion, or the plan of any work under contract during its progress, except with
the consent and approval of the superintendent of public works and the state
engineer, nor unless a description of such alteration and such approval be
in writing and signed by the parties making the same and a copy thereof filed
in the office of the state engineer. No change of plan or specification which
will increase the expense of any such work or create any claim against the
state for damage arising therefrom shall be made unless a written state-
ment, setting forth the object of the change, its character, amount and the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

expense thereof, is submitted to the canal board, and their assent thereto at a meeting when the state engineer was present is obtained."

The Oswego Canal, alongside the plaintiff's premises, had been laid out, surveyed, and mapped, and work on the section embracing it had been contracted for and the contractors were actually engaged in constructing the canal. Between the walls of the plaintiff's building and the old canal was a towpath which belonged to the state. The plan of the improved canal eliminated the towpath so that the wall of the canal would abut the wall of the plaintiff's building. The canal wall at this point was to be 4 1/12 feet wide on the top. The original plan contemplated that the state should build an underpinning to the claimant's mill, 3 feet in width, to sustain and help support the mill, the canal, and the canal wall. But before the plans were approved by the superintendent of public works the underpinning wall was omitted from the plans and specifications, and it was therefore no part of the canal as laid out and approved. While the contractors were engaged in constructing this section of the canal according to the approved plans, a special deputy state engineer, on December 31, 1907, without the approval of the canal board or the superintendent of public works, filed in the office of the state engineer a map of the plaintiff's property, with a certificate that the land had been permanently appropriated for the use of the canals of the state. The duplicates having been filed in the office of the superintendent of public works, he, January 8, 1908, caused to be served upon the plaintiff a notice of the filing of the map, the survey, and certificate in his office. April 15, 1908, the superintendent of public works questioned the propriety of the appropriation, and April 30, 1908, the canal board adopted a resolution requesting the state engineer to appropriate only so much of the claimant's property as was necessary to shore up the walls or to alter the plans of the canal by changing the allignment so as to make it unnecessary to appropriate any of the property, and thereafter the line of the canal was moved westerly so that the claimant's land was not used or interfered with otherwise than by the mere filing of the map and notice above stated. The property alleged to have been appropriated was situated between the canal and a hydraulic canal, and its width averaged from 40 to 60 feet, and it was nearly covered with large stone and wooden buildings and was used as a knitting mill. Plaintiff alleges that immediately after the notice was filed it ceased taking orders for further business, although it continued to operate the mill for over a year thereafter. The claim filed in the Court of Claims states the damages at over $1,000,000. The evidence as to damages is not in the record; but it is stated that the claimant's evidence tended to show a damage of about $700,000 and interest, while the evidence of the state tended to show the damage as low as from $125,000 to $150,000.

The Court of Claims dismissed the complaint, finding that: The appropriation was unnecessary "and was the result of the absence of the exercise of any judgment upon the part of the state engineer." "The state engineer, in making the alleged appropriation, acted without the exercise of any judgment and acted arbitrarily and capriciously and the attempted appropriation was wholly unauthorized and illegal and void." "That the state had the right to construct its canal adjacent to the claimant's building without taking precautions to protect the building from falling so long as it did not encroach upon any part of the claimant's property."

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, SEWELL, and BETTS, JJ.

Benjamin N. Cordozo and Charles N. Bulger (Udelle Bartlett, of counsel), for appellant.

Thomas Carmody, Atty. Gen., and Valentine Taylor (Joseph A. Kellogg, of counsel), for the State.

JOHN M. KELLOGG, J. "Private property cannot be taken for public use unless it is necessary for such public use, but all that is required of such officer or board in determining the necessity for

taking private property is that they act in good faith and with sound discretion." People v. Fisher, 190 N. Y. 468, 477, 83 N. E. 482, 485.

The officer referred to in that case was the state engineer, who had permanently appropriated certain lands, and the court was asked to determine that a permanent appropriation was unnecessary, as a temporary appropriation was sufficient. The court sustained the appropriation. It was apparent that the officer acted in good faith, and there was at least reasonable basis for his action.

In the Appellate Division (People v. Fisher, 116 App. Div. 677–686, 101 N. Y. Supp. 1047, 1053) the same conclusion was reached; the court saying:

"We do not decide that where an officer of the state assumes to take private property, ostensibly in the exercise of a discretionary power vested in him by the Legislature which clearly can be seen, under no circumstances and in no event, will be needed for public purposes, that courts may not intervene and determine contrary to the expressed judgment of such officer the question of the necessity for taking the same, and judicially declare such an assumption of power nugatory."

[1-3] In every appropriation of private property for alleged public use, the purpose of the appropriation—that is, whether it in fact involves a public use—is a question open to the courts for consideration, for unless there is a public use the act of appropriation is unwarranted. In this case the line of the canal was fixed, and the state engineer was charged with the duty of examining into the facts and passing his judgment as to what property was necessary for canal purposes. He could not act arbitrarily, capriciously, or without judgment, as no such power is given to him. His power to condemn arises only from an exercise of a sane judgment and sound discretion, and it is evident there must be some basis for his judgment and discretion to rest upon. The property ought to be condemned must in fact be necessary, or at least so situated with reference to the canal work that there may be an honest difference of opinion among reasonable men as to its necessity. If we assume that the state engineer has filed a certificate appropriating a farm 10 miles away from the canal, and which under no circumstances could be available for canal purposes, the invalidity of his action would be apparent. A determination in good faith as to the necessity, and the exercise of a sound discretion with reference to property as to which there is some real basis for such determination, is a condition precedent to his right to condemn. On the other hand, it may be conceded, if the appropriation in question was the result of a determination made in good faith that it was necessary, and there was a reasonable basis upon which such determination can rest, that the courts may not set up their judgment as to its necessity against the judgment of the state engineer. It is his judgment, and not the judgment of the court, that is made the condition precedent to the act.

It is clear that the claimant's property was not required as a spoil bank or for convenience in making the canal, for the reason that it was substantially covered by large stone and brick buildings and was therefore impossible for that purpose. The state engineer did not give to the court the benefit of his evidence as to the good faith of the

appropriation, and the special deputy, who was sworn as a witness, falls far short of showing that the appropriation was made in good faith or was even deemed necessary. The appropriation map was served January 8, 1908. April 15, 1908, the superintendent of public works questioned the propriety of the appropriation and asked the state engineer with reference to it. No answer was ever directly given to the superintendent, but a communication from the special deputy to the engineer was furnished to the Attorney General April 21, 1908, in which he indicates the propriety of the appropriation on the ground that the canal wall was not of sufficient strength to hold the water in the canal without a lateral pressure against the walls of the building, and "if at any time there should be any excavation made on the property adjacent to the wall it would result in the destruction of the wall." He also stated that in his judgment it was not feasible to extend the canal wall further west and leave an embankment between the wall of the canal and the wall of the claimant's property; and that, as the canal wall was to be only about four feet at the top, "the state would have no available room on either side of the canal; and that, this being a terminal of the canal, it seems that the state should have sufficient land adjacent to the canal for the purpose of providing facilities for boats tying up while waiting to pass the locks." He does not in the communication question the sufficiency of the wall except in the contingency that the wall of the claimant's building and the earth easterly of it are removed, leaving the canal wall without support. As a witness, he expresses a fear that the claimant's wall might fall into the canal during the excavation.

The reasons given by him—and they are the only reasons furnished by the state engineer's office—seem to be rather excuses than reasons, and do not indicate in the light of all the evidence the good faith of the appropriation. It was not for the engineer, after the plans and specifications had been approved and the contract let, to change the plans providing for places for boats to tie up in the use of the canal or to appropriate land which could not be used for any purpose contemplated by the plans approved.

No reasonable suggestion is made in the evidence that any particular use was to be made of this mill property, or any part of it, and no suggestion why, if an underpinning of the mill was desired, that right was not obtained or the three feet condemned. It was stated that an underpinning to the mill was desirable, not that any use was contemplated of the entire property. It is evident that the underpinning to the mill was as desirable to the claimant as to the state, and undoubtedly, if the claimant had understood that no favors were to be granted, it would gladly have conceded without compensation the right to underpin the mill for its own safety and protection. The act of the special deputy, if valid, would have resulted, if the state had built the underpinning to plaintiff's mill, in making the plaintiff's foundation secure, at a conceded expense to the state of from $125,000 to $700,-000. The fact that the work on this section of the canal was being performed at that time under a contract, and that it was therefore impracticable to use these lands for canal purposes without the con-

sent of the canal board as indicated below, furnishes the strongest possible reason for the conclusion that an appropriation of them without the consent of the canal board was absolutely unnecessary, and that the alleged appropriation was without any judgment and arbitrary and capricious. The facts in this case are such that there can be no honest difference of opinion upon the question that the appropriation of this $700,000 mill property was not necessary for canal purposes, and that it was not the judgment of the state engineer or his deputy that it was necessary. The Court of Claims has mildly characterized it by saying, in substance, that it was arbitrary, capricious, and without the exercise of any judgment.

[4] The judgment may also be sustained upon the ground that the state engineer at the time he acted had no legal authority to make an appropriation. Section 6 of the act was intended as a check upon him so that, after contract let, the maps, plans, and specifications may not be altered without the approval of the superintendent of public works, and, if a proposed change would enhance the cost to the state or create a claim against it, the assent of the canal board must be had. It is apparent that, if this appropriation is sustained, the cost of this section of the canal must be enhanced from $125,000 to $700,000 for land damages, in addition to whatever it may cost to make any use of the property taken. It was impossible to build the canal in any other place or manner on the contracted section without the consent of the canal board. These lands could not be used for canal purposes without a change of plan and contract. The appropriation of additional land there for canal purposes could not be necessary and the state engineer had no power to make such appropriation. The work could only be done by contract, and the contractor was actually engaged upon the work. Plaintiff was chargeable with knowledge of the law that at that time no change in the plans could be made by the engineer acting alone. Whoever deals with a public officer is charged with knowledge of his powers. If, as alleged, plaintiff stopped taking new orders in the mill upon the service of the notice, the loss must fall upon it, as it must be assumed to have such knowledge of the facts as it would have learned on proper inquiry. If the special deputy acted without judgment, he was clearly not acting in the interest of the state. He evidently did not act involuntarily, but for a purpose, and no one could be benefited by that purpose but the plaintiff. If the map was filed as a matter of favor or otherwise to the plaintiff, it is not aggrieved. In any event, the evidence here does not put plaintiff in the place of a person who has been injured by the wrongful act of the state engineer. If it was not a party to the act, it is chargeable with knowledge of the law and the plain facts on which the officer acted. It was its duty, before making important commitments, to inquire as to the legal power of the officer and to ascertain the facts. At an early day the claimant knew that the state took the position that the alleged appropriation was unnecessary and ineffectual, and that the canal was actually being built without interfering with the property. If the claimant has suffered loss, the inference is quite strong that it was willing to take the chances of loss in view of the

large gain expected if the appropriation could be sustained. A sworn claim filed for $1,000,000 and an attempt to prove but $700,000 of it suggests that the plaintiff expected large benefits from the appropriation. At the most the loss coming to it, if it innocently sustained a loss, came from omitting to take orders for a very short time. When it surrendered up the property and discontinued its business, it clearly knew the facts. From what appears and does not appear in the record the plaintiff apparently knew, or willingly chose not to know, the facts and the law governing the situation.

By abandoning its proprty with notice that the state repudiated the alleged appropriation and would not use the land, it chose to stand upon its legal rights. It stands upon an order made without power or right, and the judgment of the Court of Claims is right upon the law and the facts and should be affirmed, with costs.

SEWELL, J., concurs. HOUGHTON, J., concurs on ground last stated.

SMITH, P. J. (dissenting). The Ontario Knitting Company claims damages for an alleged appropriation of its land for the purposes of the barge canal. Relief has been denied in the Court of Claims on the main ground that the appropriation was unnecessary and therefore unauthorized.

Prior to the construction of the barge canal, the claimant's property abutted the blue lines of the Oswego Canal. Adjoining the claimant's property was the towpath of that canal about 15 feet in breadth. On the other side of the claimant's property was an hydraulic canal, so that claimant's property at the place in question varied in width from 40 to 60 feet. The original plans for the construction of the barge canal involved the elimination of this towpath and the building of the canal up plumb to the blue line or the foundation of the claimant's mill. It also provided for the underpinning of the claimant's mill at points where the foundation of the mill did not go to solid rock. The canal board was informed by the Attorney General that there was no authority for entering upon the claimant's land for the purpose of placing this underpinning thereupon without permission of the claimant. The contract for the construction of the canal at this point as actually made therefore left out the underpinning of claimant's property. From the evidence it seems clear that this was omitted, not for the reason that it was unnecessary as a support to the wall of the canal, but because of want of authority to enter upon the land for that purpose and with the idea thereafter of making further plans for the strengthening of the wall of the canal at that point. The testimony of Mr. Stevens, the superintendent of public works, makes it clear that it was then understood, either that the wall must be strengthened at this point, or that the canal must be moved further to the west in order to leave sufficient room for a firm wall in the canal itself beyond the claimant's property. It is found by the court below as a fact that upon April 30, 1909, after the appropriation of claimant's land, the canal board adopted a resolution requesting the

state engineer to appropriate only so much of claimant's property as
was necessary to shore up the walls or alter the plans of the canal
by changing the alignment so as to make it unneccessary to appropri-
ate any of the property.   Thereafter, and after the acts constituting
the claimed appropriation, the lines of the canal were changed so that
the canal was placed further west, making it unnecessary to use any
of the claimant's property.  If the canal had not been moved further
to the west, the state would have required at least three or four feet
off from the land upon which rested claimant's building for the actual
sustaining wall without regard to what space might be necessary or
convenient beyond the three or four feet for the purpose of building
such wall.   After the making of this contract, this situation became a
matter of discussion between the state engineer and deputy state en-
gineer, and it was thereupon decided that the best course for the state
would be to appropriate the entire property.   Thereafter an appro-
priation map was duly made and duly filed in the state engineer's of-
fice and in the office of the superintendent of public works giving a
full description of the claimant's property, and a copy thereof was
duly served upon the claimant, so that under section 4, chapter 147,
of the Laws of 1903, the title of said property became vested in the
state of New York.   There is some question made as to the regularity
of these proceedings, in that the original map on file in the state en-
gineer's office was not signed by the state engineer himself.   It was
signed, however, by the special deputy engineer whose act in this
respect under the statute was the act of the state engineer himself.
Laws of 1903, c. 147, § 8.   Also the copy filed with the superintendent
of public works was certified *by the state engineer* as a copy of an
appropriation map *made by himself* and that copy or a duplicate there-
of was the map served upon the claimant, so that in my judgment
there can be no question that all the formalities of law were observed
necessary to divest the claimant of the title to this land and to appro-
priate it to the benefit of the state.

Before discussing the law which I deem applicable to this case, it
may be well to advert to the imputation of bad faith upon the part
both of the claimant and the state engineer cast by the prevailing opin-
ion, by insinuation perhaps more than by direct claim.   In response
to this, it may be well to note that no bad faith has been found by
the trial court either on the part of the claimant or the state engineer;
nor is any bad faith claimed on the part of either by the Attorney Gen-
eral in his brief; nor is there the slightest evidence of bad faith in
the record before us.   The claimant's land has been taken without its
consent, and all forms have been followed necessary to vest the title
absolutely in the state.   The course of the claimant in refusing to
take orders after the formal appropriation by the state is claimed to
evince an undue eagerness upon its part to sell its land to the state.   If
we consider a moment, however, it is apparent that the claimant could
do nothing else.  The title to its land had been taken by following the
mode prescribed by the statute, which is made by the statute *conclu-
sive evidence of title in the state.*   With title divested and a lawsuit
upon its hands for compensation, the credit of the company was neces-

sarily largely impaired. As will hereafter appear, it was no defense to the claimant that the state engineer exercised bad judgment, provided only he had the power to appropriate this land. In this situation I submit that the claimant pursued the only course that was open to it, and proceeded to close up its business, recognizing the title in the state. Again, the fact that claim was made for $1,000,000 of damage, and the proof only showed $700,000, is claimed to be evidence of bad faith. If a lawyer were bound to make proof of all the damage claimed in his complaint, and in default of which he were adjudged to have acted in bad faith in thus drawing that complaint, very few lawyers would escape disbarment. The intimation that the plaintiff would prefer large damages from the state has very little weight with those who know of the scrupulous jealousy with which the Court of Claims guards the state treasury. If any claimant ever filed a claim before the Court of Claims with any hope of getting more than he was entitled to, he was invariably doomed to grave disappointment. In this case, if the Court of Claims were directed to give to this company the loss which it had suffered by the appropriation of this property, there is not the slightest danger that the state would be subjected to any excessive damages. Nor is there the slightest evidence of the bad faith of the state engineer. According to the plans of the canal under which the contract was made, that wall needed strengthening. At least three or four feet was necessary upon which the strengthening wall should be placed. Considerably more than that amount was necessary for the doing of the work. To condemn that three or four feet would involve the tearing down of the claimant's mill, or at least so much of a destruction that the damage to the claimant would be almost as much as the taking of all of claimant's property. After the wall had been strengthened and the work had been done, what remained of the land could have been sold by the state, if the Legislature had seen fit to authorize, at a price which would minimize, if it would not entirely overbalance, the amount of damage which the state would have to pay for the whole mill. *And this can now be done.* There is no constitutional prohibition which will prevent the Legislature directing the sale of this property, and the price which it should bring upon a public sale would be some evidence of its value upon the trial of this claim for damages, and would go to repay the state for the compensation which it should pay to claimant. This land would not become a part of the forest preserve, and would not become so far a part of the Oswego Canal as would bring it within the provision of section 8 of article 7 of the State Constitution. That provision has been construed as meaning that:

"Neither the canals as highways of commerce, nor other property owned by the state connected with the canals and actually essential to their operation and maintenance, shall be sold or leased." Sweet v. City of Syracuse, 129 N. Y. 317 (27 N. E. 1081, 29 N. E. 289).

It might well have been held that the state engineer was wiser than was the canal board in afterwards changing the alignment of the canal so as to render unnecessary the taking of any of this property. Moreover, this land might be used in various ways in connection with the

use of the canal and in connection with the construction thereof, as will be hereafter considered. All these matters were discussed between the state engineer and his deputy, and the state engineer exercised his best judgment in making this appropriation.

Whatever might have been the effect of collusion between the claimant and the state engineer, it seems to me clear that any bad faith on the part of the state engineer alone is wholly immaterial to this controversy. I have not overlooked the authority of People v. Fisher, 190 N. Y. 468, 477, 83 N. E. 482. But that was a case where the person whose property was claimed to have been appropriated was contending that there was no lawful appropriation of the fee. In resisting the right of the state to appropriate, the owner might well claim that the judgment of the state engineer should be exercised in good faith before it should authorize the taking of her property in invitum. Where, however, the owner of the estate does not resist the appropriation by the state, but simply claims damages for that appropriation, the state is estopped from denying the good faith of its constitutional officer in making that appropriation. Otherwise the owner of property would be at the mercy of the state, or rather of the state engineer, who could allege his own bad faith in case by a change of plans the property should afterwards become unnecessary for the purposes of the canal. The only question in this case upon which the right of the plaintiff must, it seems to me, depend, is whether the state engineer and superintendent had authority for any purpose to appropriate this land.

The authority of the state engineer to appropriate this land is found in section 4, c. 147, of the Laws of 1903. That statute provides:

"The state engineer may enter upon, take possession of and use lands, structures and waters, the appropriation of which for the use of the improved canals and for the purposes of the work and improvement authorized by this act, shall in his judgment be necessary."

Under this statute the state engineer represents the sovereignty of the state. His appropriation, if made for the purposes authorized in the statute, is just as effective as would be the appropriation by specific act of the Legislature itself. He is a constitutional officer and within the limits of the instructions given him by the Legislature acts under constitutional as well as statutory authority. While the determination as to whether the purpose for which this land had been appropriated is a public purpose is a matter subject to review by the court, his determination of what land is necessary for that purpose is the determination of the sovereign state and is not subject to review by the courts. His reasons for making the appropriation are not the subject of judicial inquiry. In People v. Fisher, 116 App. Div. 677, 101 N. Y. Supp. 1047, in the prevailing opinion it is said:

"It is the general rule that the necessity for exercising the right of eminent domain is a question of political rather than of a judicial nature; that its determination rests with the Legislature, and the courts have no power to review it; and that the Legislature may delegate the power to public officers, whose determination is likewise conclusive upon the courts. Matter of Fowler, 53 N. Y. 60; People v. Smith, 21 N. Y. 595. And so whether it will take the title in fee or simply acquire an easement is likewise a question of

that character. As was said by Judge Andrews in Sweet v. B., N. Y. & P. R. Co., 79 N. Y. 293, 300: 'When the statute authorizes the taking of a fee, it cannot be held invalid, or that an easement only was acquired by proceedings thereunder, on the ground that in the judgment of the court the taking of an easement only would accomplish the public purpose which the Legislature had in view. That is a legislative and not a judicial question.'"

In Matter of Fowler, 53 N. Y. 60, it was held:

"As the Legislature may delegate the exercise of the right of eminent domain to municipalities, to boards of officers, and to public agents, the necessity of an appropriation of lands by those upon whom this right is conferred cannot be inquired into by the courts. If the use to which the lands are to be put is public, the Legislature, or the instrumentality which it employs, is the sole judge of the necessity, unless there is a provision otherwise in the enactment."

In Shoemaker v. United States, 147 U. S. 282, 298, 13 Sup. Ct. 361, 390 (37 L. Ed. 170), Shiras J., speaking for the court said:

"The adjudicated cases likewise establish the proposition that, while the courts have power to determine whether the use for which private property is authorized by the Legislature to be taken is in fact a public use, yet, if this question is decided in the affirmative, the judicial function is exhausted; that the extent to which such property shall be taken for such use rests wholly in the legislative discretion, subject only to the restraint that just compensation must be made."

In Lynch v. Forbes, 161 Mass. 308, 309, 37 N. E. 438, 42 Am. St. Rep. 402, the opinion reads:

"The plaintiff contends in both cases that the taking was unlawful, and at the trial of the case in trespass he offered to show that, prior to the taking in question, the town had taken all the land that it needed, and that this was not suitable and was not necessary, useful, or proper for any of the purposes named in the acts under which it was taken.  *  *  *  In the absence of any provision in the statutes submitting the matter to a court or jury, the decision of the question lies with the body or individuals to whom the state has delegated the authority to take. They have the same power as the state, acting through any regularly constituted authority, would have"—citing cases.

In City of Boston v. Talbot, 206 Mass. 82, 91 N. E. 1014, the state was building a subway. It condemned not only the land required for the tunnel itself, but also adjacent land, which would probably be injured, and did this in order to economize the expense of damage claims. The validity of the condemnation was sustained. This case is very analogous to the case at bar, and the opinions of the learned justices writing therein go very far toward establishing the right of the state engineer to condemn the whole of this property, even though it be conceded that part only was necessary for the purposes of the construction of the canal. It sanctions the condemnation of the whole property as economically made, as the taking of part would of necessity destroy the structures and the part not needed could be sold or leased or used for other purposes by the state. In the view I take of this case, however, it is not necessary here to go to that extent.

The authorities cited would seem to be sufficient to show that the question of the lack of necessity of these lands for the purposes of the canal upon which the judgment of the court below is based is a matter for the state itself alone to determine and is not a subject to

review by the court. This rule of law has thus been held under the authorities cited as against the protest of the landowner that his constitutional right has been invaded by the taking of his property. If under his protest authority therefor can be found, a fortiori where the state has assumed to appropriate the land and the property owner without questioning the right of appropriation is seeking to recover damages therefor, it does not lie with the state to say that, although the land was taken as necessary at the time it was taken, nevertheless by an alteration of plan it has become unnecessary, and therefore the state repudiates the act of its agent lawfully authorized thereto and declines either to take the property or to pay damages therefor. If the contention of the state be upheld, the law has played a very cruel trick upon this claimant. There is no proof of collusion or fraud upon the part of the state engineer or this claimant. With the authority given to the state engineer to appropriate land for the purposes expressed in the statute every formality required to divest the claimant of this land has been complied with. The claimant, acting in good faith, immediately closed up his contracts which were pending and did only so much new business as was necessary to close out the stock on hand. It would be a strange rule of law if this claimant was required at his peril to employ experts and prove in a court of law that the taking of the whole or a part of these premises was *not* necessary or advantageous to the state. If it had been to the advantage of the state to take possession of this property, the claimant's objection that the whole or a part thereof was unnecessarily taken would not hold for a moment. Whether or not it was a wise policy for the state engineer to appropriate all of this property the Legislature left to the engineer to determine. People v. Fisher, 190 N. Y. 468, 83 N. E. 482. The law has since been amended so as to limit the power of the state engineer in the appropriation of lands to those only the appropriation of which is approved by the canal board, but such was not the statute at the time these lands were taken.

It is urged by the state that by a subsequent change in the line of the canal the taking of any of this property has been rendered unnecessary, and that this judgment of the Court of Claims in effect revests the title of the land in the claimant. However plausible this argument may be, we cannot affirm this judgment upon this ground: First, because the law does not authorize the courts to revest title in any such indirect manner; and, secondly, as a matter of equity, to so hold would deprive the claimant of his right of compensation for the injury to his business which naturally followed after the original appropriation by the state. If this property had once been lawfully appropriated, it can be returned to the claimant only under some statutory power which is here lacking. If there be any way in which the state can evade the payment of the price of condemnation by revesting the title of the land in the claimant, it certainly cannot be done by giving back any doubtful title or by any judgment of the court arbitrarily misconstruing the enactments of the Legislature.

Another contention on the part of the state to which reference should be made is that the power of the engineer is limited by section

6 of the act referred to, so that this appropriation could only be made with the consent of the canal board. As I read the statute, however, the appropriation of lands for the purposes of the canal or of the work of improvement thereof is authorized by section 4, and the alteration of contracts referred to in section 6 as requiring the consent of canal boards is simply the alteration of contracts for work upon the canal. The appropriation of lands for the purposes of the canal or of the work to be done thereupon at any stage in the proceedings was vested in the state engineer alone until the act was amended subsequent to the appropriation of the land in question. The evident purpose of section 6 is to prevent frauds by authorizing the enlargement of contracts to favorites after the contract had once been assigned through competition. The taking of this land does not in any way alter the construction contract. The necessary sustaining wall may be built by a new contract with some other contractor. No alteration of any contract is in any way involved.

We are thus brought to the final contention on the part of the state, to wit, that the state engineer was at this time limited in his power to the appropriation of lands within the blue line of the canal as first plotted. The minimum width of the prism of the canal was to be 75 feet. There was no maximum width prescribed, nor were the powers of the state engineer in any way circumscribed in the laying out of the canal, except that in cities he was to make the width less than 45 feet only with the approval of the canal board. By section 3 of the act referred to the route must be laid out by the state engineer, and he was thereby "authorized and required to make such deviations therefrom as may be necessary or desirable for bettering the alignment, reducing curvature, better placing of the structures and their approaches, securing better foundations or generally for any purpose tending to improve the canal and render its navigation safer and easier." By section 4 he was authorized to appropriate lands for the use of the improved canal "and for the purposes of the work and improvement authorized by this act" which should in his judgment be necessary. Under the contract for the construction of this part of the canal as it then existed the evidence overwhelmingly establishes that part at least of this land was necessary for the actual placing of the supporting walls to make firm the foundation of the canal. It would seem to the extent of the land which was necessary for that purpose that the claim for damages is indisputable, and this conclusion alone would reverse the judgment. This land was just above a contemplated lock. Whether by reason of this fact this land was necessary either in the use or construction of the canal was for the engineer to determine. In addition to that part of the land needed for the actual placement of the supporting wall, how much was in his judgment needed for the purpose of the construction of this wall was for the state engineer to determine. He has certified that all was needed and the claimant was foreclosed from asserting the contrary. After the claimant's land has been taken in conformity with the statute after certification by the constitutional state officer that all was needed for purposes for which he was authorized to appropriate the same, the Court of Claims had

denied compensation on the ground that the state engineer exercised no judgment in appropriating any of this land. The law does not play battledore and shuttlecock with a man's property. That the state engineer did exercise his judgment is plain. Whether wisely or not is not for us to judge. His acts are conclusive upon the state, even though by a change of plan the land be not now needed. Claimant is entitled to compensation, and judgment should be reversed, with costs, and a new trial ordered.

BETTS, J., concurs.